IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

GREGORY MOORE

        Petitioner,

    vs.                               No. 11-3230-SAC

DAVID R. MCKUNE, et al.,

        Respondents.

MEMORANDUM AND ORDER

    This case comes before the Court on Gregory Moore's petition for a writ of habeas corpus pursuant to 28 USC § 2254.

## I. Background

    Petitioner was convicted by a jury in the District Court of Sedgwick County, Kansas of capital murder, aggravated kidnapping, criminal possession of a firearm, and four counts of attempted capital murder. Petitioner was sentenced to life imprisonment without parole, plus 1,094 months. The Kansas Supreme Court affirmed Petitioner's convictions. *State v. Moore,* 287 Kan. 121, 194 P.3d 18 (2008). Petitioner thereafter filed a K.S.A. 60-1507 motion, but that motion was denied after a hearing. The denial was affirmed by the Kansas Court of Appeals, *Moore v. State*, 253 P.3d. 386, 2011 WL 2555655 (Kan.App.2011) (Case No. 104,267) (Unpublished Opinion), and the Kansas Supreme Court denied review.

Petitioner then timely filed this application for federal habeas corpus relief, and the State admits that Petitioner has exhausted his available state court remedies.

Petitioner makes three general claims: 1) that the district court erred in excluding testimony from his toxicology expert; 2) that trial counsel was constitutionally ineffective; and 3) that the district court erred by not instructing the jury on voluntary intoxication.

## II. Underlying Facts

The facts of the case as determined by the Kansas Supreme Court in Petitioner's direct appeal follow:

> Shortly after midnight on April 9, 2005, Newton police were dispatched to Moore's residence on a domestic disturbance call. Officers met outside with H.A., the 14–year–old daughter of Alveda Sparks, who lived at the residence with Moore. H.A. told officers that Moore was holding her mother inside and was beating her. H.A. had run outside and called 911 on her cell phone. H.A. warned officers that Moore had a handgun tucked into the waistband of his pants. Officers knew Moore as a serious substance abuser; he was known to have recently used methamphetamine and was under surveillance by officers for suspicion of manufacturing methamphetamine. Moore was also known to be combative and violent toward law enforcement. The officers at the scene called in an emergency response team (ERT).
> Detective Townsend Walton, who was outside the residence, attempted to reach Moore on his cell phone without success. About 3 a.m., Sparks called 911 and spoke to Harvey County Undersheriff Steve Bayless at dispatch. Sparks told Bayless that H.A. had overreacted, that nothing bad was going on, that Moore did not have a gun, and that she and Moore wanted H.A. to come back home. Walton called Moore shortly thereafter and talked with him from outside the residence. Moore assured Walton that, although he had a crossbow, he did not have any firearms.
> At Walton's behest, Moore agreed to speak with Walton and Bayless through the front door. The officers asked Moore to show Sparks to them so that they could verify her safety. Moore obliged by

turning on a light. Sparks was sitting on the couch, putting on her shoes. Walton asked Moore to allow Sparks to leave the residence, and Walton heard Sparks tell Moore that she was leaving. When Moore turned around to argue with Sparks, Walton saw a magazine clip in Moore's waistband before Moore slammed the door.

Officers heard a dull thud, consistent with someone being struck, and they heard Sparks screaming. Walton then broke glass in or near the door, reached into the house, and unlocked and opened the door. Sparks warned officers that Moore had a gun; and the officers waved in ERT members. As the officers, their weapons drawn, entered the residence, Sparks ran out and Moore began firing. Moore's shots struck Harvey County Deputy Sheriff Kurt A. Ford in the head and Hesston Police Detective Christopher D. Eilert in a calf, a shoulder, and both hands. Moore also fired at Walton and Harvey County Sheriff Investigator B.J. Tyner. The officers had not fired; except for Tyner, who returned fire after Ford and Eilert fell. Walton and Newton Police Officer Tony Hawpe pulled Ford and Eilert from the residence, and the ERT members withdrew. Ford died of his wounds.

Moore called Walton and told him he was "reloaded and ready for more blood." When Moore learned from a friend that he had shot two officers, he called Walton again. Walton remained in contact with Moore by phone for more than 4 hours before Moore finally surrendered to law enforcement about 8 a.m. During the 4 hours, Moore learned that one of the officers was dead, and he said that he was convinced he would be shot if he emerged from his home. Moore also told Walton that he had been defending himself and that, if any officers tried to come into his home, he would shoot them.

Moore was charged with one count of capital murder in violation of K.S.A. 21–3439(a)(5), two counts of attempted capital murder under the same subsection and K.S.A. 21–3301 for his shooting of Eilert and Tyner; one count of aggravated kidnapping under K.S.A. 21–3421; and one count of criminal possession of a firearm contrary to K.S.A. 21–4204. In an amended complaint, the State added two more counts of attempted capital murder for the shots fired at Walton and Bayless.

...

During opening statement, the prosecution introduced its theory of the case: that Moore had beaten Sparks and held her against her will and that, when police were called, he decided to go down in a blaze of glory, planning to "blast" as many police officers as he could even though it might cost him his life.

Moore, on the other hand, suggested that the crimes arose from a perfect storm, a coincidence of events that he did not want or intend. Under this interpretation of the facts, Moore believed that he

3

was going to die that night—that he would be shot to death by police if they entered his home or he left it. Laboring under this belief, when Moore saw the ERT members come inside in full gear and with weapons drawn, he panicked and did what he honestly believed he had to do to defend himself. Consistent with this theory, Moore's counsel pointed out that, after Moore fired and saw officers fall, Moore did not shoot at the comrades who dragged them away. Instead, he immediately called police and eventually surrendered.

The State called H.A., who testified about the events leading up to the stand-off. She testified that Moore and her mother had begun arguing; that he had pulled a bedroom door off its hinges and had broken a broomstick over his knee and held it to Sparks' throat. He also had punched H.A.'s dog. H.A. testified that Moore had a gun and would not let her mother leave when she wanted to do so. Eventually, Sparks told H.A. to go outside and call the police, which she did. The audio recording of H.A.'s 911 call was admitted into evidence and then played for the jury. On cross-examination, H.A. testified that generally Moore was nice and she liked him. When he drank, she said, he became mean, violent, and paranoid. She testified that she did not think Moore had been drinking the day or evening before the crimes, but she did not know.

Bayless also testified about the events of the evening; and Sparks' 911 call, during which Bayless spoke with Moore, was admitted into evidence and then played for the jury.

Scott Powell and Marc Smith of the Newton Police Department, who were present at Moore's residence at the time of the crimes, gave testimony substantially similar to Bayless'. Brian Rousseau, an ERT member, testified about ERT training, strategy, and the events of the evening. Walton also testified at some length.

Sparks testified that she and Moore had been arguing off and on all night April 8, continuing into April 9. Her account of events was similar to H.A.'s. At one point, she said, Moore lunged at her. Her testimony was inconsistent on whether Moore hit her, but she agreed that she eventually directed H.A. to go outside and call police. At that point, Moore was armed with at least one gun. Once Moore became aware that police were coming, Sparks testified, he "started freaking out," grabbing another pistol and a shotgun, and made Sparks get into a closet with him. He told her that he was not going to go to jail, that the police were going to try to shoot him, that there would be a "shootout" and "bloodbath," and that she would die with him. He also said that the confrontation would be her fault.

Sparks testified that she told Moore she needed to use the bathroom. Moore forced her to get into the shower with him, and they stayed in the shower until the hot water ran out. Sparks said she did

not want to be naked when the police came in, and she began putting her clothes back on. This angered Moore, and he hit her in the shin with the gun and threatened to shoot her heel off. When he put two guns to her ribs, the phone rang. The police were outside and trying to reach them.

Sparks eventually called 911, and she and Moore both talked with police. Although she testified at trial that she was afraid of Moore, on the phone she told police that Moore did not have a gun; and she heard Moore tell police the same thing. She testified that Moore agreed to talk with police at the front door, and he put the guns under the mattress in the bedroom. While Moore was talking with the officers, Sparks came into the front room with a bag she had packed and began putting on her shoes. Moore saw her and said that he thought she had said she would not leave. He then slammed the door and punched her in the hip, and she screamed. Sparks testified that, when Moore then headed back to the bedroom, she believed he was going for the guns. She was afraid for her life and ran out the door where the officers were gathered.

On cross-examination, Sparks testified that Moore had a drinking problem, that he used prescription painkillers for a back injury, and that he had begun using illegal drugs, including methamphetamine. When he was using these substances, she said, he became mean, violent, and angry, all of which he was at the time of the crimes. When asked if she had seen Moore consume any alcohol or methamphetamine on April 8 or 9, she said that she had not.

Ed Bartkoski of the Kansas Bureau of Investigation (KBI) testified that, when he processed the crime scene, he discovered two firearms in defendant's residence—one in the kitchen, one in the bedroom. Each weapon was fully loaded, one with hollow point ammunition. Bartkoski testified that multiple shell casings were recovered from the scene consistent with the loaded weapons. In addition, the KBI recovered seven rifles and four shotguns from the residence, along with accompanying ammunition; a bullet-proof vest; drug paraphernalia consistent with narcotic use; and prescription pain medication.

Two casings found at the scene were consistent with a weapon issued to law enforcement. Tyner's testimony covered the weapons, gear, and armor used by the ERT. Tyner had been carrying a .40 caliber pistol and a shotgun; Ford had been carrying a rifle; and Eilert had a submachine gun. Tyner testified that the team entered out of its usual formation. Although Tyner was supposed to enter first with a ballistic shield, he was knocked out of the "stack" when Sparks ran out of the home. Thus, Ford entered first, followed by Eilert and then Tyner. When Moore fired, Ford and Eilert fell, and Tyner fired his

pistol. Rousseau and Officers Maurice Montano and Brian Hall entered from the back of the home.

Tyner also testified that the ERT initially planned to enter the home to rescue Sparks. When she ran out, they were already committed to entry; so their goal changed from hostage rescue to effecting Moore's arrest.

Eilert provided substantially similar testimony concerning the events, and he discussed his injuries.

Thomas Curt Taylor, a long-time friend of Moore, testified that he woke up on April 9 with a feeling "something was wrong with [Moore]." Taylor called Moore, who told him that "all hell broke loose." Moore said he had just "shot a cop," that he had "blasted the cops." Moore also told Taylor that he was not going to jail; rather, he was going out in a "blaze of glory," an exit that Moore had often mentioned. Taylor said he encouraged Moore to surrender, but Moore was "not wanting to surrender at all."

Taylor also said Moore talked about his experience in the military police, and he related an anecdote in which Moore had refused to relinquish his firearm because, he said, he was a soldier and that was how he was trained. Taylor also testified that Moore struggled with alcoholism and had begun using illicit drugs. Taylor said Moore could be mean and paranoid when drinking. Taylor did not specifically testify about his impression of Moore's sobriety during their phone conversation, but he said that it seemed Moore was "in a zone."

Amy Coody, a KBI firearm and toolmark examiner, testified that Moore's two pistols discharged multiple rounds, including the bullet recovered from Ford's head, and that the only officer's weapon that had been fired was the .40 caliber pistol, presumably Tyner's.

...

On behalf of the defense, Raymond E. Riniker, an investigator for the Kansas Death Penalty Unit, testified that he discovered large quantities of full, partially full, and empty beer and liquor bottles at Moore's residence.

Moore requested an instruction on voluntary manslaughter based on imperfect self-defense and on voluntary intoxication, the second conditional on the district judge's evaluation of Martinez' testimony.

...

The district judge concluded that Martinez' methodology comported with the *Frye* standard; however, the testimony was inadmissible because there was no evidence that Moore had been using drugs on the night of the crimes. On the contrary, Sparks testified she did not think he had been, and police testified that their conversations with Moore both before and after the shootings were coherent. The district

judge said, "I'll find as a matter of law that I do not have sufficient
evidence to give a voluntary intoxication instruction."
     The district court also declined to give a voluntary manslaughter
instruction based on imperfect self-defense, *i.e.,* that a person who
harbors an honest but unreasonable belief in the necessity of exerting
deadly force in self-defense is guilty of voluntary manslaughter rather
than capital murder. …
     The jury found Moore guilty as charged. When, after a separate
sentencing proceeding, the jury was unable to reach a unanimous
verdict on imposition of the death penalty, the judge sentenced Moore
to life imprisonment without parole, plus 1,094 months.

*State v. Moore,* 287 Kan. at 122-130.

## III. AEDPA Standard

This matter is governed by the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA"). AEDPA imposes a "highly deferential

standard for evaluating state-court rulings, and demands that state-court

decisions be given the benefit of the doubt." *Renico v. Lett,* 559 U.S. __, 130

S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010) (citation and internal quotation

marks omitted). Under AEDPA, where a state prisoner presents a claim in

habeas corpus and the merits were addressed in the state courts, a federal

court may grant relief only if it determines that the state court proceedings

resulted in a decision (1) "that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the

Supreme Court of the United States" or (2) "that was based on an

unreasonable determination of the facts in light of the evidence presented in

the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is "contrary to clearly established Federal law" when: (a) the state court " 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' "; or (b) " 'the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent .' " *Maynard v. Boone,* 468 F.3d 665, 669 (10th Cir. 2006) (quoting *Williams v. Taylor,* 529 U.S. 362, 405 (2000)). A state court decision involves an unreasonable application of clearly established federal law when it identifies the correct legal rule from Supreme Court case law, but unreasonably applies that rule to the facts. *Id.* at 407–08. Likewise, a state court unreasonably applies federal law when it either unreasonably extends, or refuses to extend, a legal principle from Supreme Court precedent where it should apply. *House v. Hatch,* 527 F.3d 1010, 1018 (10th Cir. 2008).

In order to obtain relief, a petitioner must show that the state court decision is "objectively unreasonable." *Williams v. Taylor,* 529 U.S. 362, 409 (2000) (O'Connor, J., concurring). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007). "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court

misapplied Supreme Court law." *Maynard v. Boone,* 468 F.3d 665, 671 (10th Cir. 2006).

## IV. Exclusion of Toxicology Expert's Testimony

Petitioner first contends that the trial court's exclusion of the testimony of his toxicology expert, Dr. Terry Martinez, denied him his right to present a defense. Petitioner's counsel proffered Dr. Martinez' testimony in support of his voluntary intoxication theory. Chiefly, Dr. Martinez proffered that a urine test completed soon after Petitioner's arrest indicated a near-lethal level of methamphetamine in Petitioner's system, which may have caused delusions, hallucinations, and bizarre violent behavior.

### A. Right to Present a Defense

The Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." *California v. Trombetta,* 467 U.S. 479, 485 (1984)). But the right to present a defense is not unlimited and is subject to reasonable restrictions. *United States v. Scheffer,* 523 U.S. 303 (1998); *Chambers v. Mississippi,* 410 U.S. 284, 295 (1973). The right must bow to "other legitimate interests in the criminal trial process." *Hardaway v. McKune*, 125 Fed.Appx. 955, 956-57 (10th Cir. 2005), quoting *Chambers*, 410 U.S. at 295. The Due Process Clause does not guarantee a criminal defendant the right to introduce all relevant evidence, as evidence that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence may be properly excluded. *Montana v. Egelhoff*, 518 U.S.

9

37, 42 (1996). The Constitution affords trial judges "wide latitude" to exclude evidence that is repetitive or only marginally relevant, or poses an undue risk of harassment, prejudice, or confusion of the issues, or is otherwise excluded through the application of evidentiary rules that serve the interests of fairness and reliability. *Crane v. Kentucky*, 476 U.S. 683, 689-90 (1986).

### B. Trial Proceedings

Under Kansas law, voluntary intoxication may be taken into account for a limited purpose:

> An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind.

K.S.A. 21–3208(2). The capital murder and attempted capital murder charges against the Petitioner included intent and premeditation as elements. *See* K.S.A. 22–3439(a)(5).

The State filed a motion in limine to exclude Dr. Martinez's testimony, contending that the theories he relied on were not generally accepted within the forensic toxicology community, as required under *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923), and Kansas law.[1]

> Moore provided the State with the report of his toxicology expert, Dr. Terry Martinez. At a *Frye* ... hearing regarding Martinez' proposed

---

[1] To determine the admissibility of expert scientific opinion evidence, Kansas courts continue to apply the general acceptance test set forth in *Frye*, rather than the test set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). See *State v. Shadden*, 290 Kan. 803, 818 (2010).

expert testimony, the State acknowledged that Moore's urine screen, done at the hospital after his arrest, suggested the presence of methamphetamine. The State argued, however, that its expert would testify that Martinez' method of extrapolating backward from urine screen values to suggest that Moore had ingested near-lethal doses of methamphetamine before the crimes was scientifically unreliable, and that even literature relied upon by Martinez stated as much. The State maintained that such extrapolations could only be made reliably from blood tests, and no blood samples were taken from Moore. The defense argued that Martinez' testimony would be pure opinion and that its introduction in the guilt phase of trial would support an instruction on voluntary intoxication. The district judge informed the parties that Martinez could not testify unless he could support his scientific method through the professional literature.

*Moore*, 827 Kan. at 124.

During a *Frye* hearing, Petitioner's counsel proffered the testimony of

Dr. Terry Martinez in support of his voluntary intoxication theory.

Out of the presence of the jury, Martinez took the stand. He referred to several scientific texts in addition to his own experience, including Baselt, Disposition of Toxic Drugs and Chemicals in Man (7th ed. 2004), and Levine, Principles of Forensic Toxicology (2d. rev. ed. 2006) and testified about his evaluation of the results of Moore's urine screening. Martinez said that at 8:35 the morning of his arrest Moore's urine contained more than 7,500 nanograms per milliliter of methamphetamine and 2,709 nanograms per milliliter of amphetamine; and it had a pH of 6. Martinez said amphetamine is the major metabolite of methamphetamine, and it is generally accepted in the scientific community that the expected ratio of methamphetamine to amphetamine is 10 to 1 over a wide range of pH values. In his view, given the amphetamine level in Moore's urine, one might extrapolate that his methamphetamine level was 27,000 nanograms per milliliter, a borderline lethal level, according to Disposition of Toxic Drugs and Chemicals in Man. Martinez also testified that there is faster excretion of methamphetamine and amphetamine in acid urine. Defendant's urine, with a pH of 6, was more acidic than urine with a neutral pH of 7.
    Martinez then discussed the effects of methamphetamine on the human body, particularly on the nervous system. He opined that methamphetamine in the level shown by Moore's urine would cause delusions, hallucinations, and bizarre, violent behavior.

On cross-examination, Martinez was asked to read passages from his reference authorities. One stated that "it is difficult if not impossible to answer questions regarding dosage, mode of intake, degree of impairment, or the frequency of use [from urinary excretion of a drug]." Another of the authorities indicated that there was "no direct relationship" between "impairment and the urine concentration of a drug"; that "identification of a drug in urine, therefore, only indicates that the suspect has been exposed to that drug"; and "that there is no well-established correlation between blood concentration and performance impairment for any drug other than alcohol."

The district judge concluded that Martinez' methodology comported with the *Frye* standard; however, the testimony was inadmissible because there was no evidence that Moore had been using drugs on the night of the crimes. On the contrary, Sparks testified she did not think he had been, and police testified that their conversations with Moore both before and after the shootings were coherent.

*Moore*, 287 Kan. at 128-29.

## C. Kansas Supreme Court Ruling

The Kansas Supreme Court upheld the exclusion of Dr. Martinez's

testimony, finding it was not based on admitted evidence, was vague or

speculative, and was not helpful to the jury's understanding of the case.

Our careful examination of Martinez' proffer convinces us that there was nothing he could have contributed to the jury's understanding of the case, even if the jury had been given a voluntary intoxication instruction.

To begin with, the report of the urine screening performed shortly after Moore was arrested was not admitted into evidence. No foundation for it was laid, and no hearsay exception was established. This report was the sole basis for Martinez' expert opinion, and Kansas law requires an expert's opinion to be supported by admitted evidence. See *State v. Gonzalez,* 282 Kan. 73, 80–88, 145 P.3d 18 (2006). Second, even if a voluntary intoxication instruction had been given, Martinez admitted that he needed more information to opine on Moore's actual impairment at the time of the crimes. Although his report stated that "habitual use" of the "massive levels of methamphetamine" that would produce the values in Moore's screening report "are known to result in toxic psychosis characterized

12

by paranoia, delusion, hallucinations, bizarre and violent behavior," he was unable to testify about the timing of Moore's ingestion of drugs or the effect the drugs actually had on him in particular.

We also see some similarity between this case and *State v. Lawrence* … in which we ruled that a treating physician could not testify about the effect that the risk of being injured or killed in a shooting may have on African–American men. We ruled that such general testimony could not be employed in that case to support an argument that a particular African–American man … possessed an honest belief in certain circumstances that he must use deadly force in self-defense. … As we recognized in *Lawrence,* vague or speculative testimony about what may be true about certain members of a group on various occasions is not the same as testimony about what was true about a particular member of that group on a specified occasion.

*Moore*, 287 Kan. at 136-137.

### D. AEDPA Review

In cases such as this, the petitioner bears the burden to "explain the relevance of the proffered-but-excluded evidence." *Morris v. Burnett*, 319 F.3d 1254, 1273 (10th Cir. 2003). Further, "the trial judge's view of the proffer, which was seconded by the [state] Court of Appeals, is entitled to great deference." *Morris*, 319 F.3d at 1273. Under 28 U.S.C. § 2254(e)(1):

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Petitioner contends that once the court ruled that the expert's methodology comported with the *Frye* standard, everything else was a question of weight and credibility for the jury. But under Kansas law, expert testimony that lacks proper foundation is inadmissible. *See e.g.*, *Marshall v.*

13

*Mayflower Transit, Inc.*, 249 Kan. 620 (1991); K.S.A. 60-456(b)(1) (expert testimony in the form of opinions or inferences must be based on "facts or data perceived by or personally known or made known to the witness at the hearing.") Similarly, expert testimony that is not necessary or helpful to the jury is inadmissible. *State v. Cooperwood*, 282 Kan. 572, 576 (2006). Here, no evidence suggested that Petitioner took methamphetamine before the crimes occurred, yet temporally close enough to the crimes to have affected his intent or premeditation. Even if the urine screening had been admitted, it remained equally likely that Petitioner took methamphetamine after the crimes occurred (around 4:00 a.m.) but before his arrest (around 8:00 a.m.). No factual basis for the proffered testimony was established.

The evidentiary rules applied by the trial court serve the interests of fairness and reliability, and are not arbitrary or disproportionate to the purposes they are designed to serve. *See Kuhn v. Sandoz Pharmaceuticals Corp.*, 270 Kan. 443, 454-455 (2000); *Holmes v. South Carolina,* 547 U.S. 319, 324 (2006). Petitioner cites no Supreme Court precedent governing the permissibility of a trial court's discretionary decision to exclude expert testimony under an otherwise valid evidentiary rule. The Kansas Supreme Court's determination that Dr. Martinez's proffered testimony was inadmissible was based on a reasonable determination of the facts, and was not an unreasonable application of United States Supreme Court precedent. No basis for habeas relief has been shown.

## V. Failure to Instruct on Voluntary Intoxication

Petitioner additionally claims that the district court committed constitutional error in failing to instruct the jury on his defense of voluntary intoxication.

Petitioner's counsel requested a voluntary intoxication instruction, but the district court found the evidence insufficient to warrant it. The court noted that Sparks, who was in Petitioner's presence the night of the crime, was not aware of his drinking or using drugs. And Bayless and Walton spoke with Petitioner for several hours that evening, yet observed no sign of any impairment from alcohol or drugs, and believed that Petitioner clearly understood what was going on and communicated coherently.

On appeal, the Kansas Supreme Court found the refusal to instruct on voluntary intoxication to be error because the district judge "weighed the evidence supporting and undercutting the instruction rather than simply determining whether the minimum evidence necessary to require the instruction was present." *Moore*, 287 Kan. at 134. The Supreme Court found sufficient circumstantial evidence that Petitioner was under the influence at the time of the crimes, based on the following: Petitioner's residence was littered with empty and full beer cans and liquor bottles; Petitioner had a history of alcohol and drug abuse and his behavior became mean, violent, and paranoid when he was under the influence; and Petitioner behaved in a mean, violent, and paranoid manner on the night of the crimes. *Id.*

Nonetheless, the Kansas Supreme Court found that even if the failure to instruct on voluntary intoxication was constitutional error, it was harmless error, stating:

> ... given the enormous weight of the evidence against Moore, we hold that the judge's error in refusing to give a voluntary intoxication instruction error was harmless. This is true regardless of whether we view the error as one of constitutional magnitude, infringing on Moore's right to present his theory of defense, or as nonconstitutional trial error. Compare *State v. Atkinson,* 276 Kan. 920, 925, 80 P.3d 1143 (2003) (constitutional error harmless if appellate court "willing to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial"), and K.S.A. 60–261 (reversal not required unless refusal to grant it "inconsistent with substantial justice," error affected party's "substantial rights"); *see State v. Jones,* 277 Kan. 413, 423, 85 P.3d 1226 (2004). Moore made repeated and cogent ... statements about his expectations for the evening, about a "bloodbath," and about his demise in a "blaze of glory." Those expectations were, at least in part, realized.

*Moore*, 287 Kan. at 134-135.

In a habeas corpus case, the Court assesses the prejudicial impact of a state court's constitutional error under the *Brecht* standard. *Fry v. Pliler,* 551 U.S. 112, 119-121 (2007). That standard asks whether the alleged error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 627 (1993).

Under Kansas law, the Petitioner's intoxication could have been considered only in determining whether he lacked the intent or premeditation required for his charges of capital murder and attempted capital murders. Given the nature and weight of the evidence about Petitioner's actions and statements surrounding the commission of the

16

crimes, including his stated expectations that the evening would involve a "bloodbath" and his demise in a "blaze of glory," the Court finds that the district court's failure to instruct on voluntary intoxication, even assuming it rose to the level of constitutional error, did not have a substantial or injurious effect or influence in determining the jury's verdict. The Kansas Supreme Court reasonably found that the weight of the evidence against the Petitioner was "enormous." Its determination that the error was harmless is consistent with the *Brecht* standard, and was not an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence presented.

The Court rejects Petitioner's assertion in his traverse that the error in not permitting his defense of voluntary intoxication was structural error rather than harmless error. *See Rose v. Clark,* 478 U.S. 570, 576-79 (1986).

> ... if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis. The thrust of the many constitutional rules governing the conduct of criminal trials is to ensure that those trials lead to fair and correct judgments. Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed. As we have repeatedly stated, "the Constitution entitles a criminal defendant to a fair trial, not a perfect one."

*Rose*, 478 U.S. at 579 (citations omitted).

## VI. Ineffective Assistance of Counsel

Petitioner also contends that his trial counsel was constitutionally ineffective in the following respects: 1) failing to continue Petitioner's trial to

17

have blood samples tested; 2) presenting intentionally false testimony regarding the existence of blood samples; 3) failing to support Petitioner's defense of voluntary intoxication; and 4) failing to support Petitioner's theory of imperfect self-defense. Petitioner additionally contends that counsel's cumulative error warrants relief.

To prevail on a claim for ineffective assistance of counsel, Petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). In reviewing for deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. A petitioner demonstrates deficient performance by showing counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

**A. Procedural Default**

Respondents contend that the following claims are procedurally defaulted because they were not included in Petitioner's direct appeal or in his K.S.A. 60-1507 proceeding: 1) Petitioner's claim that his counsel failed to continue petitioner's trial; 2) Petitioner's claim that his counsel presented intentionally false testimony; and 3) Petitioner's claim of cumulative error.

18

Petitioner responds that the first two were included in his claims of error regarding his voluntary intoxication defense, and that the third (cumulative error) need not be raised to a state court, as it is merely a standard for review.

Petitioner states that the record "establishes that petitioner argued that trial counsel failed to know that blood samples had been collected from his client and he further told the court that it was his understanding that there wasn't any blood samples collected." Dk. 11, p. 11. Petitioner states he further argued that because of trial counsel's lack of knowledge, he failed to request a continuance to get the blood samples tested, which would have better supported his voluntary intoxication theory of defense." *Id.* But Petitioner fails to cite the record in support of these claims, or to show the Court these were raised as separate issues for review by the state court.

Because Petitioner has not shown that he presented these claims for review by the highest state court, federal habeas review of these claims is barred unless Petitioner demonstrates both cause for his procedural default and resulting prejudice, or that a fundamental miscarriage of justice will result if his claims are not considered. *See Coleman v. Thompson*, 501 U.S. 722, 749 (1991).

Petitioner does not allege or demonstrate cause for his failure to present these claims to the state court. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (finding that " 'cause' under the cause and prejudice test

must be something external to the petitioner.") Neither has Petitioner shown actual prejudice. The "cause and prejudice" exception is thus not applicable.

Nor has Petitioner demonstrated that he qualifies for review under the fundamental miscarriage of justice exception. *Herrera v. Collins,* 506 U.S. 390, 403–04 (1993). To be excused from procedural default on the basis of this exception, petitioner must supplement his constitutional claim with a "colorable showing of factual innocence." *Kuhlmann v. Wilson,* 477 U.S. 436, 454 (1986); *Brecheen v. Reynolds,* 41 F.3d 1343, 1356 (10th Cir. 1994), *cert. denied,* 515 U.S. 1135 (1995). Petitioner has not alleged, and the record would not support, a colorable showing of factual innocence.

Additionally, as for Petitioner's claim of cumulative error, that analysis applies only where the record reveals two or more actual errors, and the entire trial was so fundamentally unfair as to constitute a violation of due process rights. *Hoxsie v. Kerby,* 108 F.3d 1239, 1245 (10th Cir. 1997). Below, the Court finds that Petitioner has not established any prejudicial errors in his conviction or sentence, thus no cumulative error can be shown.

## B. Failing to Support Petitioner's Theory of Voluntary Intoxication

Petitioner primarily contends that his trial counsel was deficient for failing to test his blood to determine the amount of methamphetamine in his system shortly after he was arrested. Petitioner believes that had his blood been tested for methamphetamine, had the results of that test been

admitted, had the results shown that he was voluntarily intoxicated during the crimes, and had an expert so testified, the Court would then have instructed the jury on that theory and the jury may have convicted him of voluntary manslaughter instead of capital murder.

The Kansas Court of Appeals held that even if trial counsel was deficient in failing to test Petitioner's blood for methamphetamine, Petitioner suffered no prejudice as a result "because the evidence against him was so overwhelming." *Moore,* 2011 WL 2555655 at *3. The court observed that Petitioner was "unable to establish, given the overwhelming evidence against him as highlighted by the Supreme Court in *Moore,* that, but for counsel's errors, there is a reasonable probability that the result of the trial would have been different." *Id.*

Petitioner's burden on this issue is to show that there is no reasonable argument that his trial counsel satisfied *Strickland's* deferential standard. *Harrington v. Richter*, ––– U.S. ––––, ––––, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011). *See White v. Medina*, 2012 WL 401518, *2 (10th Cir. 2012)*. Petitioner does not allege that at any time when a blood test would have been timely enough to be relevant, he asked his attorney to conduct such a test, or told his attorney he was voluntarily intoxicated at the time of the crimes, or told his attorney facts which may have raised a reasonable suspicion that he had taken methamphetamine. *See Strickland,* 466 U.S. at 691 (noting that counsel's actions may be judged in light of the information

provided to him by the defendant). This, coupled with the enormous weight of the evidence against the Petitioner as noted by both the Kansas Court of Appeals and the Kansas Supreme Court, shows the objective reasonableness of the Kansas Court's decision that *Strickland's* standard was satisfied.

Petitioner concedes that the evidence that he shot the officers was well established, making his mental state the key issue in the case. Petitioner appears to believe that evidence of his methamphetamine level, if admitted, would have negated his intent to shoot the officers. But the statements made by the Petitioner to Walton, Sparks, and Taylor over several hours during the course of the crimes on April 9th were so clear and so direct as to demonstrate that even if Petitioner were high on methamphetamine at the time of the crimes, he nonetheless retained the ability to formulate the intent and premeditation which were essential elements of those crimes. The Kansas Supreme Court's finding that Petitioner was not prejudiced by counsel's actions or inactions was thus reasonable.

**C. Failing to Support Petitioner's Theory of Imperfect Self-defense**.

One of Petitioner's theories at trial was that he had an honest but unreasonable belief that he would be shot to death by police if they entered his home or he left it. Had that theory succeeded, Plaintiff could have been convicted of voluntary manslaughter instead of capital murder. *See Moore*, 287 Kan. at 131, citing *State v. Carter,* 284 Kan. 312, 326 (2007)

22

("imperfect self-defense is not a defense to criminal liability; it is a lesser degree of homicide.")

At the time of Petitioner's trial, K.S.A. § 21-3403 defined voluntary manslaughter to include "the intentional killing of a human being committed: … (b) upon an unreasonable but honest belief that circumstances existed that justified deadly force under K.S.A. 21–3211…." That statute provided:

> A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such force is necessary to defend such person or a third person against *such other's imminent use of unlawful force*.

K.S.A. 21–3211 (emphasis added). Moore did not testify at trial, but argued that sufficient evidence of his "unreasonable but honest belief" was presented through other witnesses, namely Taylor and Sparks.

### 1. Trial Proceedings

The trial court refused to instruct on the imperfect self-defense theory, stating:

> … I don't have any testimony that he had an honest belief. I have testimony that, after the incident, he did tell Detective Walton that he was acting in self-defense. But I find you can't have an honest belief under these circumstances that you're acting in self-defense. He knew — he knew why [the officers] were there, he knew what was going to happen, and he's not entitled to that instruction. There was no honest belief of self-defense.

Trans., Case 06-dr-700, Vol. III, p. 122-23.

### 2. Kansas Supreme Court Ruling

23

The Kansas Supreme Court rejected Petitioner's related claim that the judge erred in failing to instruct the jury on the lesser included offense of voluntary manslaughter based on imperfect self-defense, stating:

> In order for him to be convicted of voluntary manslaughter based on imperfect self-defense, the jury would have had to conclude the circumstances could warrant an honest belief that the uniformed officers who entered Moore's home were aggressors threatening imminent use of "unlawful" force. ... Moore's jury could not reasonably do so on the record before us.

*Moore*, 287 Kan. at 131.

The court explained:

> There is no question that [Petitioner] appreciated that the persons at his door were law enforcement officers, that he appreciated the reasons they had gathered outside his home and desired to enter it, and that Sparks was a hostage until virtually the same moment that the police came through the door. [Petitioner] fired at the officers in spite of his undeniable knowledge of their identity and purpose. Under these circumstances, [Petitioner] simply could not have harbored an honest but unreasonable belief that the deadly force was necessary.

*Moore*, 287 Kan. at 133.

### 3. Kansas Court of Appeals Review

The Kansas Court of Appeals, in reviewing Petitioner's § 60-1507 appeal, described Petitioner's deficient counsel argument as follows:

> [Petitioner] argues that his attorney was ineffective when he failed to investigate why Deputy Kurt A. Ford (who was killed) was carrying a rifle magazine that was missing several rounds. If it could be determined that Ford fired the first shot, the jury would be more likely to believe that [Petitioner] had a reasonable belief that he needed to shoot Ford in self-defense. Therefore, [Petitioner argues his] attorney was ineffective for not investigating Ford's weapon.

*Moore,* 2011 WL 2555655 at *3. This is the same argument which Petitioner now makes to this Court.

The Kansas Court of Appeals found "absolutely no evidence in the record to suggest that Ford fired his rifle at all." *Moore*, 2011 WL 2555655 at *3. It noted that Ford was carrying a .223 caliber rifle, but the only casings found were fired from a .45 caliber pistol, a .380 caliber pistol, and a .40 caliber firearm.

### 4. AEDPA Review

The Kansas Court of Appeals applied *Strickland*, and found neither deficient performance by Petitioner's counsel, nor prejudice to Petitioner. In addition to the facts noted above, the record reflects that Deputy Chris Eilert testified that Ford did not fire his weapon, and that no contradictory evidence was presented. Petitioner does not allege that he told his counsel that he saw or heard Ford fire his weapon, or gave counsel any other information that would have warranted an investigation of Ford's weapon. Under these circumstances, which show neither deficient performance by counsel, nor prejudice to the Petitioner, no objective unreasonableness has been shown. The Court of Appeals' application of *Strickland* was reasonable, thus this claim does not warrant federal habeas relief.

**VII. Evidentiary Hearing**

The court finds no need for an evidentiary hearing. "[A]n evidentiary hearing is unnecessary if the claim can be resolved on the record." *Anderson*

*v. Attorney Gen. of Kansas,* 425 F.3d 853, 859 (10th Cir. 2005); *see Schriro v. Landrigan,* 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."). The record in this case refutes Petitioner's allegations and otherwise precludes habeas relief.

## VIII. Certificate of Appealability

Rule 11 of the Rules Governing Section 2254 Proceedings states that the court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. "A certificate of appealability may issue … only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a district court has rejected the constitutional claims on the merits, a petitioner makes that showing by demonstrating that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). *See United States v. Bedford,* 628 F.3d 1232 (10th Cir. 2010). Petitioner has not met this standard as to any issue presented, so no certificate of appealability shall be granted.

IT IS THEREFORE ORDERED that the petition for habeas corpus relief under 28 U.S.C. §2254 (Dk. 1) is denied.

Dated this 7th day of November, 2012 at Topeka, Kansas.

s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge